USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 5/9/2021

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------- X
                                                                            :
BRUDERMAN ASSET MANAGEMENT,       :
LLC                                                    :
                                                       Plaintiff,      :                          20-CV-3164 (VSB)
                                                                     :
                           - against -                   :                          **OPINION & ORDER**
                                                                     :
REAL TIME CONSULTANTS, INC.,           :
                                                                     :
                                                   Defendant.    :
                                                                          :
------------------------------------------------------- X

Appearances:

Nathan A. Goldberg
Schoeman Updike Kaufman & Gerber LLP
New York, NY
*Counsel for Plaintiff*

Carmine J. Castellano
Joseph P. Goldberg
Hodgson Russ LLP
New York, NY
*Counsel for Defendant*

VERNON S. BRODERICK, United States District Judge:

       Plaintiff Bruderman Asset Management, LLC ("Plaintiff" or "Bruderman") brings this action against Real Time Consultants, Inc. ("Defendant" or "Real Time") for breach of contract and negligence. Before me is Defendant's motion to dismiss Plaintiff's complaint. (Doc. 18.) For the reasons below, Defendant's motion to dismiss is GRANTED IN PART and DENIED IN PART.

I.   **Factual Background**[1]

Plaintiff is a New York limited liability company registered with the Securities and Exchange Commission ("SEC") as an investment adviser. (Compl. ¶ 1.)[2] Defendant is a New Jersey information technology consulting company that is registered to do business in New York. (*Id.* ¶¶ 3, 8.)   On or around March 1, 2016, Plaintiff and Defendant entered into a Network Management Premium Support Agreement (the "Agreement"), (Doc. 19-2), "for the support, administration, and management of the Microsoft Office platform and office environments." (Compl. ¶¶ 10, 24.) Defendant's "Premium Level" services included monitoring alerts generated by Defendant's monitoring tool, notification of unusual events, antivirus and spyware management, premium-level firewall configuration and management, and a 15-minute "ticket open" window once an alert is received. (*Id.* ¶ 10.) Other elements of the Agreement include a New Jersey choice-of-law provision; a limitation of liability clause; a disclaimer of warranties provision; and a requirement that any amendments to the Agreement be in writing and signed by both parties. (*Id.* ¶ 11.)

The Agreement provided for a 12-month term that automatically renews for another 12-month term unless one of the parties gives 60-days written notice of its intention to terminate or modify the Agreement. (*Id.* ¶ 12.)   The Agreement automatically renewed on March 1, 2017 and March 1, 2018. (*Id.*)

On or around February 21, 2018, one or more unidentified persons (the "Intruders") in Nigeria gained access to Plaintiff's email environment, and access to the email account of a

---

[1] The facts set forth herein are taken from allegations in the Complaint. (Doc. 10.)  I assume Plaintiff's allegations in the Complaint to be true for purposes of the motion. *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007).  However, my reference to these allegations should be not construed as a finding as to their veracity, and I make no such findings.

[2] "Compl." refers to Plaintiff's Complaint filed on April 29, 2020.  (Doc. 10.)

particular financial adviser employed by Plaintiff. (*Id.* ¶ 13.) This access went undetected until sometime in May 2018. (*Id.*) On or around April 21, 2018, the Intruders obtained access to the administrative privileges for Plaintiff's server, changing them to (1) forward certain internal emails to an unknown Gmail account, and (2) move certain emails into the archive folders of Plaintiff's employees rather than delivering them first to those accounts' inboxes, such that those employees would not see the emails when they came in. (*Id.*) Defendant did not detect this activity. (*Id.*)

On or around May 13, 2018, the Intruders in Nigeria accessed Plaintiff's fax email account and the email account of a Bruderman Managing Director, Andrew J. Leblanc ("Leblanc"). (*Id.* ¶ 14.) The Intruders created an email rule for the email accounts of Leblanc, Jannine Barbosa ("Barbosa"), Plaintiff's then-Chief Operating Officer, and other employees that moved certain emails into a separate folder without first sending those emails to their main email inboxes. (*Id.* ¶ 15.) On or around May 14, 2018, Leblanc received an email from an Outlook email address, requesting that he transfer $950,000 from the account of one of Plaintiff's clients to a bank in Hong Kong. (*Id.* ¶ 16.) Although Leblanc never saw the email because of the changed email settings, the Intruders forwarded the email to Jannine Barbosa, Plaintiff's then-Chief Operating Officer, along with a forged authorization form, requesting that she process the transfer. (*Id.*) Barbosa emailed Leblanc requesting that he call her to discuss the issue; Barbosa subsequently received a response from Leblanc's email account that said: "Everything is in the right order. I checked it all carefully." (*Id.*) Barbosa then transferred the funds by wire. (*Id.*)

On or around May 15, 2018, the Intruders used a similar scheme to effectuate a $2,000,000 transfer from one of the same client's accounts to a bank in Hong Kong. (*Id.* ¶ 17.) The next day, Barbosa received another wire transfer request, but determined the request was

fraudulent and Bruderman contacted the FBI and Hong Kong police. (*Id.* ¶ 18.)

Plaintiff subsequently engaged STI Group, an incident response team, to evaluate the nature and severity of the breach. (*Id.* ¶¶ 18–20.) STI Group conducted its evaluation and determined that "several administrative, technical and procedural controls for access management, logging and training monitoring were not in place and contributed to the inability to detect the activity earlier and prevent the incident." (*Id.* ¶ 19.) STI Group detailed that there were at least six "expected security controls" that were not in place at the time of the security breach:

- Centralized system logs available for review,
- Clearly defined onboarding and off-boarding procedures for controlled approval of end-user access and authorization,
- Access controls to prevent outside parties from accessing the email system,
- Preventing the sharing of administration accounts, or at least providing better accounting for actions taken from those accounts,
- Multi-factor authentication for email and remote access, and
- Monitoring and logging of third-party access and associated activity.

(*Id.*) Plaintiff alleges that all of these services were those that Defendant was expected to provide to Plaintiff pursuant to the Agreement. (*Id.* ¶¶ 19–20.)

Plaintiff has paid its client back for the full $2,950,000 it erroneously wired from the client's account. (*Id.* ¶ 21.) On or around November 12, 2018, Plaintiff terminated the Agreement, citing Defendant's breach, and informed Defendant that it would not pay the remaining balance of its outstanding invoices. (*Id.* ¶ 22.)

## II. **Procedural History**

On April 21, 2020, Plaintiff initiated this action by filing its complaint. (Doc. 1.) On April 28, 2020, Plaintiff filed an amended motion for leave to file a corrected complaint, (Doc. 8), which I granted on April 29, 2020, (Doc. 9.) On that same day, Plaintiff filed its corrected complaint, ("Complaint"), alleging claims for breach of contract and negligence. (Doc. 10.) On

July 1, 2020, Defendant filed its motion to dismiss Plaintiff's Complaint, accompanied by a memorandum of law, declaration, and two exhibits. (Docs. 18–20.) Plaintiff submitted a memorandum of law in opposition to Defendant's motion to dismiss on July 27, 2020. (Doc. 23.) The motion became fully briefed when Defendant filed its reply memorandum of law on August 12, 2020. (Doc. 24.)

### III. Legal Standard

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim will have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. This standard demands "more than a sheer possibility that a defendant has acted unlawfully." *Id*. "Plausibility . . . depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011).

In considering a motion to dismiss, a court must accept as true all well-pleaded facts alleged in the complaint and must draw all reasonable inferences in the plaintiff's favor. *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007). A complaint need not make "detailed factual allegations," but it must contain more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted). Although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Id*.

5

## IV. Discussion

### A. *Breach of Contract*

As a preliminary matter, I note that I am relying in part on the text of the Agreement itself in evaluating this motion to dismiss. A complaint is "deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995)). Plaintiff did not append the Agreement as an exhibit when it filed its Complaint. Yet, "[e]ven where a document is not incorporated by reference, [a] court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint." *Id.* at 153 (internal quotation marks omitted). The Agreement is clearly integral to Plaintiff's Complaint here, since Plaintiff asserts a claim for breach of contract. (*See* Doc. 10.) The parties also agree that I can consider the Agreement, (*see* Doc. 20, at 6–7; Doc. 23, at 8), which Defendant submitted as Exhibit 2 to the Declaration of Carmine J. Castellano in Support of Defendant's Motion to Dismiss Complaint, (Doc. 19-2).

The Agreement states that it "shall be governed by the laws of the State of New Jersey." (*See* Doc. 19-2, at 1.) "Contractual choice of law provisions are generally enforceable under both New York law and federal common law." *Arnone v. Aetna Life Ins. Co.*, 860 F.3d 97, 108 (2d Cir. 2017). "Generally, New York courts will enforce a choice-of-law clause so long as the chosen law bears a reasonable relationship to the parties or the transaction. This is because a basic precept of contract interpretation is that agreements should be construed to effectuate the parties' intent." *Fireman's Fund Ins. Co. v. Great Am. Ins. Co.*, 822 F.3d 620, 621 (2d Cir. 2016) (internal quotation marks and citations omitted). New Jersey law bears a reasonable

relationship to the parties and transaction here, given that Defendant is based in New Jersey and offers its services from there. The parties also agree that New Jersey law should govern the breach of contract claim. (*See* Doc. 20, at 7; Doc. 23, at 4–11.) Therefore, I evaluate Plaintiff's breach of contract claim under New Jersey law.

"To prevail on a breach of contract claim under New Jersey law, a plaintiff must establish three elements: (1) the existence of a valid contract between the parties; (2) failure of the defendant to perform its obligations under the contract; and (3) a causal relationship between the breach and the plaintiff's alleged damages." *Sheet Metal Workers Intern. Ass'n Local Union No. 27, AFL-CIO v. E.P. Donnelly, Inc.*, 737 F.3d 879, 900 (3d Cir. 2013).

Defendant argues principally that Plaintiff's breach of contract claim should be dismissed because it fails "to identify in its Complaint specific provisions in the Agreement imposing contractual duties upon Real Time" related to the alleged breach here. (Doc. 20, at 10.) As Plaintiff rightly notes, (Doc. 23, at 5–6), "[t]here is some variety in New Jersey caselaw as to whether a plaintiff must identify specific contract provisions to survive a motion to dismiss," *Motamed v. Chubb Corp.*, Civ. No. 15-7262, 2016 WL 1162853, at *4 (D.N.J. Mar. 24, 2016). *Compare Latraverse v. Kia Motors of Am.*, Civil No. 10–6133 (RBK/AMD), 2011 WL 3273150, at *2 (D.N.J. July 27, 2011) ("Under the Federal Rules, a plaintiff is not required to include the contract with the complaint, or allege the specific provisions violated in the contract."), *with Franchino v. J.P. Morgan Chase Bank, N.A.*, No. 3:19-cv-20893-FLW-TJB, 2020 WL 3046318, at *4 (D.N.J. June 8, 2020) ("Under New Jersey law, 'a complaint alleging breach of contract must, at a minimum, identify the contracts and provisions breached.'") (quoting *Eprotec Pres., Inc. v. Engineered Materials, Inc.*, No. 10-5097, 2011 WL 867542, at *8 (D.N.J. Mar. 9, 2011)).

Despite the inconsistencies in the case law, under New Jersey law, "the underlying goal

7

of the pleading standard in a breach of contract case is notice." *Motamed*, 2016 WL 1162853, at *4. In other words, at the motion-to-dismiss stage, the touchstone is whether the complaint gives Defendant fair notice of the contract and the contractual provisions at issue and how they relate to Plaintiff's claim, such that Defendant is not prejudiced at the outset of the case. *See id.*; *see also Faistl v. Energy Plus Holdings, LLC*, No. 12-2879, 2012 WL 3835815, at *7 (D.N.J. Sept. 4, 2012) (rejecting claim where there are "questions as to which particular agreement even forms the basis of this claim"); *Eprotec Pres., Inc.,* 2011 WL 867542, at *8 (dismissing claims that were "vaguely drafted to the point of incoherence, making it impossible to discern with certainty which contracts they seek to enforce").

I agree with Defendant that Plaintiff's Complaint is not nearly as clear as it could have been. That said, however, Defendant cannot credibly argue that it does not have fair notice as to the Agreement in question, the alleged actions or inactions of Defendant that Plaintiff claims amounts to breach of the Agreement, or how the alleged breach led to Plaintiff's $2.95 million in claimed damages. The Agreement is a short, one-page document—one that takes no longer than 20 minutes to read—that Defendant already had in its possession and whose validity Defendant does not challenge. (*See* Doc. 19-2, at 1.) Plaintiff's Complaint describes that Defendant's services pursuant to the Agreement "included the monitoring of alerts generated by Real Time's technology monitoring tool, client notification of unusual events, premium-level firewall configuration and management, antivirus and spyware management, and a 15 minute 'ticket open' window once an alert is received." (Compl. ¶ 10.) The Complaint then details several different security breaches and "unusual events" that occurred between February and May 2018, which Plaintiff alleges Defendant did not detect and about which Defendant failed to inform Plaintiff. (*Id.* ¶¶ 13–18.) Plaintiff then alleges that a third-party company determined that six

8

"expected security controls" were missing from Plaintiff's computer system that Plaintiff alleges "were among the services that Real Time was expected to provide to [Bruderman] pursuant to the Agreement." (*Id.* ¶¶ 19–20.) Finally, Plaintiff alleges that Defendant's inability to detect the alleged breach and/or contact Plaintiff about it resulted in Plaintiff losing nearly $3 million—an allegation that Defendant's failure to implement these certain security measures was a proximate cause of the damages it suffered. (*Id.* ¶¶ 21, 25–29.)

Plaintiff's allegations are sufficiently clear to provide Defendant with notice as to what provisions are at issue. The very first paragraph of the Agreement notes that Defendant must "remotely monitor, evaluate and act on alerts generated by the remote monitoring tool then in use, install patches and provide [Plaintiff] with administration functions and problem remediation at the service level(s) selected by [Plaintiff]." (Doc. 19-2, at 1.) Two paragraphs down in the Agreement, it notes that "Real Time agrees to provide priority response to alerts generated by the remote monitoring tool then in use," that Defendant "will make every reasonable effort to resolve problems in a timely manner," and that failure to provide "complete resolution" of problems is "rare." (*Id.*) Attached to the Agreement are further details about the services to which Plaintiff was entitled based on its "Premium Level" account, including, among other things, "Alert Management," "Client Notification of Unusual Events," "Alert Response," and "Alert Evaluation." (*Id.* at 4–6.) The Complaint's factual allegations certainly implicate these provisions, even if the Complaint does not specifically identify them.

The Complaint leaves several factual questions unanswered concerning the breach of contract claim—including what services Defendant actually provided to Plaintiff during this timeframe and whether the "expected security protocols" are in fact services Defendant was obligated to provide pursuant to the Agreement. However, at the pleading stage, Plaintiff has

9

provided fair notice as to the Agreement that was validly executed, the provisions of the Agreement Plaintiff alleges Defendant failed to enforce, and how Defendant's alleged breach led to Plaintiff's monetary losses. As such, Plaintiff has met its minimal burden and has sufficiently pled its breach of contract claim.

### B. *Negligence*

Before addressing the merits of Plaintiff's negligence claim, I must determine whether New York or New Jersey law applies. Neither party suggests that the Agreement's choice-of-law provision applies to Plaintiff's negligence claim. I agree with Defendant that the contractual provision—which states that "[t]his agreement shall be governed by the laws of the State of New Jersey," (Doc. 19-2, at 1)—is not broad enough in scope to cover Plaintiff's "claims for tort arising incident to the contract," *Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir. 1996).

"A federal court sitting in diversity applies the choice-of-law principles of the state in which it sits." *First Hill Partners, LLC v. Bluecrest Capital Mgmt.*, 52 F. Supp. 3d 625, 632 (S.D.N.Y. 2014). Given that diversity is the basis for subject-matter jurisdiction in this case, (*see* Compl. ¶ 4), I will apply New York's choice-of-law principles. Under New York's choice-of-law rules, "the first question to resolve in determining whether to undertake a choice of law analysis is whether there is an actual conflict of laws." *Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1998). "Where there is no actual conflict, a choice-of-law analysis is unnecessary and New York law will apply." *Winter v. Am. Inst. Of Med. Scis. & Educ.*, 242 F. Supp. 3d 206, 218 (S.D.N.Y. 2017). "However, if the court finds an actual conflict in the applicable law of each jurisdiction, the court embarks on a choice-of-law analysis." *First Hill Partners, LLC*, 52 F. Supp. 3d at 633.

I find that there is no actual conflict between New York and New Jersey laws at issue

here. In order to determine whether an actual conflict exists, courts must determine whether "the applicable law from each jurisdiction provides different substantive rules" that are "relevant to the issue at hand" and which "have a significant possible effect on the outcome of the trial." *Fin. One Pub. Co. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 331 (2d Cir. 2005) (internal quotation marks omitted). "This does not imply, however, that before embarking on a choice-of-law analysis a court must apply the relevant substantive rules of each jurisdiction to the facts of the case and determine what the various results would be and whether they would differ." *Id.* at 331–32.

Here, the prima facie elements of a negligence tort claim under New Jersey and New York law are essentially identical—Plaintiff in both instances must establish that Defendant owes a duty to Plaintiff, Defendant breached that duty, Plaintiff was injured, and the breach of the duty was the proximate cause of that injury. *Compare 2002 Lawrence R. Buchalter Alaska Trust v. Phila. Fin. Life Assur. Co.*, 96 F. Supp. 3d 182, 218 (S.D.N.Y 2015) (setting out New York prima facie negligence elements), *with Wartsila NSD N. Am., Inc. v. Hill Int'l, Inc.*, 342 F. Supp. 2d 267, 278 (D.N.J. 2004) (setting out New Jersey prima facie negligence elements).

Contrary to Plaintiff's representation, (*see* Doc. 23, at 19), under both New Jersey and New York law, a negligence claim cannot survive in tandem with a breach of contract claim "unless a legal duty independent of the contract itself has been violated," *MVP Health Plan, Inc. v. OptumInsight, Inc.*, 765 F. App'x 615, 617 (2d Cir. 2019). This requirement has been reaffirmed many times under New Jersey law. *See, e.g.*, *Torus U.S. Servs., Inc. v. Hybrid Ins. Agency, LLC*, Civ. No. 14-01630 (KM), 2015 WL 6445788, at *5 (D.N.J. Oct. 22, 2015) ("Where a plaintiff recasts a claim of breach of contract in tort, the tort claim will not stand."); *SRC Const. Corp. of Monroe v. Atlantic City Hous. Auth.*, 935 F.Supp.2d 796, 798 (D.N.J. 2013)

11

(finding that "unless the plaintiff can establish an independent duty of care," a plaintiff cannot bring a negligence action "in addition to a contract action") (internal quotation marks omitted); *Saltiel v. GSI Consultants, Inc.*, 170 N.J. 297, 316 (2002) ("Under New Jersey law, a tort remedy does not arise from a contractual relationship unless the breaching party owes an independent duty imposed by law."). Such is the case here, since the only duty that Defendant owes Plaintiff stems from their Agreement. *See MVP Health Plan, Inc.*, 765 F. App'x at 617 (finding defendant "did not have an independent legal duty to MVP that was extraneous to the agreement").

The related economic loss rule—which "defines the boundary between the overlapping theories of tort law and contract law by barring the recovery of purely economic loss in tort, particularly in strict liability and negligence cases," *Travelers Indem. Co. v. Dammann & Co.*, 594 F.3d 238, 244 (3d Cir. 2010)—also exists as a barrier to Plaintiff's negligence claim under both New Jersey and New York law. *See also e.g.*, *id.*; *see also Dean v. Barrett Homes, Inc.*, 204 N.J. 286, 295 (2010); *Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.p.A.*, 244 F.R.D. 204, 220 (S.D.N.Y. 2007). The economic loss rule is clearly applicable here, where Plaintiff's seeks monetary damages as its sole relief. (*See* Compl. ¶ 42.)

New Jersey law has adopted at least some of the exceptions to the economic loss rule that exist under New York law, including the so-called "special relationship" exception. *See People Express Airlines, Inc. v. Consol. Rail Corp.*, 100 N.J. 246, 256 (1985). Regardless, the exceptions under New York law are inapplicable in this case, such that any potential conflict between New Jersey and New York law related to these exceptions does not "have a significant possible effect on the outcome" of the case. *Fin. One Pub. Co.*, 414 F.3d at 331. First, Plaintiff suggests that Defendant may have a "special relationship" to Plaintiff such that the economic

loss rule should not apply. Yet as Defendant rightly notes, (Doc. 20, at 17), the "special relationship" exception does not apply to relationships between computer consultants and their clients. *See Atkins Nutritionals, Inc. v. Ernst & Young, LLP*, 301 A.D.2d 547, 548–49 (2d Dep't 2003); *Nielsen Media Research, Inc.v. Microsystems Software, Inc.*, No. 99-cv-10876, 2002 WL 31175223, at *8 (S.D.N.Y. Sept. 30, 2002).

Second, Plaintiff states that the exception for "negligent performance of contractual duties" should apply. (Doc. 23, at 22) (citing *Consol. Edison Co. v. Westinghouse Elec. Corp.*, 567 F. Supp. 358 (S.D.N.Y. 1983)). Yet, this exception articulated in *Consolidated Edison* has seldom been applied, most likely because, as Plaintiff even concedes, (*see id.*), there are serious reasons to doubt that this exception in is good law, *see, e.g.*, *Media Glow Dig., LLC v. Panasonic Corp. of N. Am.*, 16 Civ.7907 (JFK)(HBP), 2019 WL 2498903, at *9 (S.D.N.Y. Mar. 6, 2019) ("more recent decisions have expressly questioned the validity of *Consolidated Edison*") (collecting cases); *Long Island Lighting Co. v. Stone & Webster Eng'g. Corp.*, 839 F. Supp. 183, 187 n.5 (E.D.N.Y. 1993) (determining that the exception articulated in *Consolidated Edison* is "outdated law"). Absent clearer authority establishing this exception as good law, I cannot apply it here.

Third, Plaintiff argues that the sudden loss of nearly $3 million triggers the exception for "abrupt, cataclysmic occurrence[s]." (Doc. 23, at 23–24) (citing *Avazpour Networking Servs. v. Falconstor Software, Inc.*, 937 F. Supp. 2d 355, 362 (E.D.N.Y. 2013)). This exception is plainly inapplicable here. Courts applying this exception have determined that it typically requires "personal injury or property damage," and does not apply where "the harm was simply replacement cost." *Sommer v. Fed. Signal Corp.*, 79 N.Y.2d 540, 552 (1992). Indeed, courts have applied this exception in the context of physical disasters that could cause bodily harm or

13

threats to public safety—such as a fire "spread[ing] out of control," *id.* at 549; the collapse of a building façade on a college campus, *Trs. of Columbia Univ. v. Gwathmey Siegel & Assocs. Architects*, 192 A.D.2d 151, 153 (1st Dep't 1993); or "a sudden, accidental and cataclysmic explosion," *Syracuse Cablesystems, Inc. v. Niagara Mohawk Power Corp.*, 173 A.D.2d 138, 143 (4th Dep't 1991). For this reason, courts have applied this exception only in instances that are "so affected with the public interest that the failure to perform competently can have catastrophic consequences." *Trs. of Columbia Univ.*, 192 A.D.2d at 154; *see also Sommer*, 79 N.Y.2d at 553 ("Fire alarm companies thus perform a service affected with a significant public interest; failure to perform the service carefully and competently can have catastrophic consequences."). The facts here are entirely different—the alleged activity involved did not present a physical threat or a threat to public interest. The only injury at issue in this case is the loss of one client's money.

Therefore, in this case, Defendant has no independent duty to Plaintiff beyond Defendant's contractual responsibilities, and Plaintiff cannot establish that it qualifies for any exception to the economic loss rule. Plaintiff's negligence claim is therefore dismissed, and Defendant's motion is granted as to Count Two.

**V.     Conclusion**

For the foregoing reasons, Defendant's motion to dismiss is DENIED as to Count One and GRANTED as to Count Two.

IT IS FURTHER ORDERED that, in accordance with Federal Rule of Civil Procedure 12(a)(4)(A), Defendant is directed to file its answer to Plaintiff's complaint within 14 days after this Opinion & Order is docketed.

The Clerk is directed to terminate the open motion at Document 18.

SO ORDERED.

Dated: May 9, 2021
      New York, New York

Vernon S. Broderick
United States District Judge